Good morning, ladies and gentlemen, and welcome to the Ninth Circuit. On today's – we'll take the cases as they appear on the calendar. Today, the cases other than the third case have been submitted on the briefs, so we'll proceed to the third case, which is the United States Securities and Exchange Commission v. Thomas Seaman. May it please the Court, James Siegel on behalf of Appellees Mark and Natalie Feathers. I'd like to reserve three minutes of my time for rebuttal. Having first managed to deny Feathers the funds necessary to secure counsel, the SEC convinced the District Court that Feathers had knowingly made two sets of misstatements. First, that the funds he controlled would not make any loans to their managing company, SBCC, to cover operating and other business expenses. Second, that any distributions to fund investors would come exclusively from the fund's profits. Yet Feathers made no such misstatements, and he certainly cannot be said to have made statements so obviously misleading that this issue can be resolved at summary judgment against him as a matter of law. Feathers did not say that the funds would not advance sums to cover SBCC's legitimate expenses. He says that the funds would not make any mortgage loans to SBCC. And Feathers did not say that the funds would not make distributions in excess of profits. He said that investors were entitled to a certain component of profits, and he separately advised them that distributions could also exceed profits. Kagan. So what is your best evidence that he did not? He said they went to the company, but who was the company? He was the company. So what is your best factual evidence that he did not receive it? Excuse me, Your Honor, that the loans weren't made to the company? Yes. We don't deny the existence of the notes receivable. The question for purpose is that he didn't benefit from those loans because he was the company. So if Your Honor is referring to the discouragement award? No. I'm referring to your assertions that the money didn't go to him. So I believe, Your Honor, that's relevant, most directly relevant to the discouragement issue, which is whether he himself, that the loans from his funds to SBCC, the managing company, whether that could be deemed to be his ill-gotten profits from his alleged fraud. Well, let me put it another way. The agreement said none of those funds would go to any member of the company. And he himself personally benefited from those funds. So I think the key here is that he never, in fact, represented that the no loans would be made to the company. There is a provision in the offering documents that said it was entitled no loans to manager, and SBCC is the manager, and the district court believed that was the case. And what is your answer to that? And our answer to that is that statement is read in context. It's plain that it doesn't apply to the sort of note received. Could you direct me to the portion of the Investor's Prime Fund offering document to which you refer? So it's at ER 137, I believe, Your Honor. That's the no loans to manager provision. And prior to that, on ER 136, there's the heading. It says general standards applicable to mortgage loans. And below that heading, it says that the funds will be engaged in the business of investing in mortgage loans. That's how the funds were intended to make money. And then it set forth nine specific provisions that governed the fund's investments in mortgage loans. And so this no loans to manager provision was one of the six provisions. So you're saying that the representation was only that the fund would make no loans, mortgage loans to the manager, but it could make unsecured loans? Well, yes, Your Honor. There might have been, in other circumstances, there might have been other loans that could contravene other aspects of the offering documents. I think it's rather odd that there's a prohibition against making secured loans to the manager, but no prohibition against making unsecured loans to the manager? No, Your Honor. There was a so Feathers was required, so other provisions of the offering documents might come into play in some circumstances. They wouldn't allow him to make unsecured loans in any amount to anyone. He was subject to a fiduciary duty. He was also required to use funds for proper fund expenses. So your position is that the loans made to SBCC or to Feathers were unsecured loans which were not prohibited or not represented as not being made by the offering documents? That's exactly right, Your Honor. So this is, again, this is a securities fraud claim. So the SEC has to identify first a false statement and then also that he no only made this false statement and knew that investors would be misled. But your argument is it came under general standards for mortgage loans. This was not a mortgage loan. However, the document suggests that the only loans having been made are the mortgage loan investments. There is no mention of other unsecured loans made to the manager or SBCC. So that's not entirely true, Your Honor. But just stepping back for the legal requirements here, that would be an omissions claim. Assuming Feathers didn't disclose the existence of the advances to cover the management expenses, that would be an omissions claim. And the SEC would have to identify some duty to disclose the fact that these loans existed. And the only possible duty the SEC has cited here is one that arises from the need to clarify an otherwise misleading statement. So the SEC has to tie this particular omission to a misleading statement. It hasn't done that here. The closest it comes is this no loans to manager provision. But as we've explained, that no loans to manager provision doesn't say no loans whatsoever may be made to the manager. It applies specifically to the mortgage loans in which the funds would invest and from which they'd make money. And so given that, and certainly at the very least, it can't be said that as a matter of law, Feathers understood. Don't you think that a reasonable investor would see the offering document and say, well, if no mortgage loans, secured investments can be made to the manager, certainly no unsecured loans can be made to the manager? No, Your Honor. I think the investor wouldn't know one way or the other because the offering document simply didn't speak to that issue. And then regardless of the issue and it says no loans of mortgage loans will be made to the manager, it doesn't imply that no unsecured loans will be made to the manager? No, Your Honor. And then even if it did, Feathers then took action to correct and clarify the statement. So in the initial documents that are issued here before the notes receivable were ever created, all it said was no loans to manager. That was the only provision here that might even possibly bear on this issue. After the notes receivable were created, Feathers then took action to secure approval from the investors and he sent them a letter requesting approval of an amendment to the operating agreement. The operating agreement to the IPF offering documents was amended and that amended offering document expressly said that the notes receivable were permissible. So at no time, again this is a securities fraud case, so they have to prove beyond all doubt because again it's also a summary judgment, beyond all doubt that no reasonable jury could think both that Feathers made a materially misleading statement and that he knew at the time he made that misstatement that it would mislead jurors. So at any time, Feathers was surprised that there might be some risk that investors were misled. He took steps to clarify it and so when he next made statements, he didn't say anything that could have misled jurors. The SEC hasn't suggested that the offering documents once amended didn't actually authorize the notes receivable. And so Feathers couldn't have had scienter at the time he made the alleged misstatements because he told investors. What you do with the language which says no loans to manager, no loans and you interpret that to mean mortgage loans. Yes, Your Honor, because it has to be referenced. Will be made by the fund to the manager or any of the affiliates except for any financing extended as part of a real estate owned or loan purchase as a result of foreclosure. The one kind of loan which is allowed to be made to the manager, mortgage loan is with respect to foreclosures. These loans were not made with respect to foreclosures. Again, Your Honor, it's because all these provisions, including that particular provision you're citing, apply only to the mortgage loans in which the funds would invest. And that's clear, again, in context. The heading is general standards applicable to mortgage loans and all of the provisions make sense only in the context of mortgage loans. But didn't the document tell investors that the purpose of the funds was to invest in mortgage loans? It said that the funds would make their money. There wasn't going to be, there's no representation of the investors that the funds would be making unsecured loans as far as their business is concerned. They were only going to make secured loans, right? The purpose of the funds was not to advance funds to SBCC in order to allow it to incur marketing expenses. That's true. The purpose of the funds was to make money through. No, not the purpose. The limited representation, the representation was that the funds would be limited to making mortgage loans. Yeah. Period, right? That wasn't violated either, Your Honor. So that's a slightly different theory and that also wasn't violated. Feathers did not, for example, if he had invested in, you know, payday loans, that would have contravened this particular provision because that would have been a means to. Wasn't he investing in payday loans for himself? No, Your Honor. What he did was, this is really, this is. These were being paid by the funds. So the way this actually occurred was he paid certain marketing and syndication expenses, they're called. In order to, this was for, these were legitimate expenses. They were for the funds. And then what happened was the auditor. Marketing expenses were for the purpose of getting people to invest in the funds. That's right, Your Honor. Not for the benefit of the people who were already invested. Well, no, that's not quite right, Your Honor. It's because once he had more capital raised, he would be able to invest in a greater pool of mortgage loans and would be able to get greater returns for his already existing investors and his future investors. And so that was the purpose of these expenses. Once those were incurred, the auditor changed his accounting treatment midstream and said those can't be treated as capitalized expenses. They have to be treated as operating expenses, which means they have to be subtracted immediately from the balance sheet. That was sort of the accounting creation that caused the notes receivable to be created. And I think this timeline is critical. Once that occurred, once Feathers recognized that the notes receivable would be created and there was this, as you've called it, a loan reflected on the firm's balance sheet, he reached out to investors and he sought approval for an amendment to the offering documents that would allow for the creation of this notes receivable. And so that's it. That's at ER-299. There's also other versions of that letter at ER-334, SCR-146. Feathers reached out to the investors and he sought approval. And then before he made any other statements, again, this is a security fraud case, before he made any other statements, those amendments were contained in the offering documents. So at no time that he made any statements respecting the possibility of any loans to the SBCC, the managing company, could it be said as a matter of law to know that those were improper. In fact, there are contemporaneous emails that the SEC itself has produced that suggests that to SBCC the note receivable to be permissible. So, for example, at ER-353, Feathers in a 2012 email says, the OC clearly outlines the manager's note approval, the dollar amounts, et cetera. So Feathers believed that this was permitted. And at the very least, that evidence is enough to create a material dispute of fact as to Scienter. Do you want to address other issues in the case? Yes, Your Honor. We would also, so the second set of misstatements that the SEC has attacked is this purported misrepresentation that all distributions would be paid out of the fund's profits. But, again, if you look carefully at the offering documents, Feathers never made any such misrepresentation. He simply said that member returns, this was a defined term, member returns would be paid, that members were entitled to a certain percentage of fund profits, roughly speaking 7.5 percent. And that was the member return. And fund investors would get that if there were sufficient profits. But nowhere did Feathers say that that would be the only source of member distributions. And to the contrary, at ER-149, this is, again, the IPF offering document, Feathers represented to the extent cash distributions exceed the current accumulated earnings and profits of the fund, they will constitute a return of capital. So it was expressly recognized in the offering documents that the cash distributions could exceed the fund's profits. And so if Feathers made that representation, he cannot have made the misstatement the SEC claims he made. And certainly, again, at the summary judgment stage where scienter is a required element of the SEC's case, he cannot be said to have knowingly made a misstatement as a matter of law. What about the registration as a broker issue? So, Your Honor, I think that there's two reasons that claim fails. First, Feathers wasn't a broker. He was the manager of an issuer. So the broker, again, I think the plain text of the relevant statute supports this. The broker is a third-party intermediary between the buyer and the seller. That's what the statutory definition is getting at. It says it has to be someone who's engaged in the business of selling securities for the account of others. Feathers wasn't doing that. He wasn't acting as a third-party intermediary. He was selling the securities of the funds that he himself managed and controlled. And there's no precedent, the SEC has said nothing, suggesting that that sort of individual acts as a broker. And regardless, even setting that aside, this is perhaps an even more simple basis for reversal, Feathers did not engage in any interstate transactions. There's an express exception in the registration requirement for interstate business. And Feathers didn't sell these securities outside of California. There's nothing in the record that suggests otherwise. The SEC cites only to a stray e-mail in which Feathers mentioned that someone had talked to someone in Taiwan. There's no evidence of any sale whatsoever. And that alone is enough to defeat the SEC's claim. Ginsburg. Well, I know your time is running out, but I — it's a mystery to me. The money was going as a loan to himself and to SBCC. Your answer is he wasn't loaning it to himself. It was a business expense to help the mortgage business? Yes, that's right, Your Honor. I mean, so that is not — our response on the merits is he never made any misrepresentations regarding the loan. But as a matter of fact, it's true. He was not taking — these were not his personal profits. He was spending these monies for the funds. It was largely based on — it was marketing costs to raise more capital in order to invest in more mortgage loans and also licensing costs associated with getting a preferred status with the SBA, which was the — which was the sort of mortgage loans that the funds were investing in. Thank you. Thank you. We'll give you a couple of minutes for a rebuttal. May it please the Court. Benjamin Vetter for the Securities and Exchange Commission. I think I'd like to start with a quick clarification. We actually have two separate funds here and two different sets of offering documents. We have offering circulars from one of the funds and private placement memorandums from the other fund. Now, there's been some discussion of attempts to obtain approvals for changes to these offering documents. There never was any changes to one set of offering documents. The documents for the SPF fund were never amended, were never changed. They have the same representation of the loans to manager throughout the period at issue here. And the documents for the IPF fund were, in fact, amended. We don't dispute that. We disagree that this attempt to obtain an amendment and the amendment itself discloses the existence of these loans, discloses the amount of the loans, or even adequately disclosed to the investors what these loans were supposed to be about and what they were doing. So there is, I think, like a disagreement there about what the facts of the record indicate. The facts are undisputed with respect to the amendment. And I think that's an important thing to remember is that there is a second set of documents that was never amended. So the approvals itself, even if you were to give Mr. Feathers the benefit of the argument, don't get him off the hook on the misleading statements. As to the SPF fund? As to the SPF fund, yes. And I want to be clear. We don't agree at all that the amendments to the IPF document adequately disclose these things or disclose to investors that the loans existed and the amount of them, which would be the necessary disclosure to get approval. And his accountant pointed this out to him in an e-mail when he said, I don't think getting approval after the fact is actually good enough. And the text of the letters themselves, which are in the record, are very clear that they don't disclose that the loans already existed or the amount of the already existing loans. And having said that, I think I'm going to start probably in reverse order of where Mr. Siegel left off, on the broker charge. Mr. Feathers is not an issuer. The statute defines issuer as one who issues securities. And I think it's undisputed here that the only issuer here is the funds. So to the extent that there is, in fact, an exemption for issuers, that issuers aren't brokers, I shouldn't say exemption, I apologize for the use of that word, that issuers aren't brokers, he is not an issuer. As we pointed out on our brief, he is at most a person associated with an issuer. The commission has a rule about when you qualify as not an issuer, as not a broker, when you are associated with an issuer. And he hasn't established that he meets any of those requirements. Let me ask you this. What does the record show as to whether he has any relationship of employment with SPF or IPF? Relationship of employment is only part of the test for a broker, Your Honor. And as far as that goes, I don't think that we are disputing that Mr. Feathers is the manager. Basically, he is SBCC, and SBCC is the manager. No, no, no. Maybe I didn't say my, he is the manager of SBCC. Does that make him a manager of SPF and IPF? I don't think I would want to say that he himself, Mr. Feathers, personally is the manager of the funds. Well, if he is a control person of SBCC under Section 20, then he, does he become a control person of the funds he controls? I mean, I suppose, I don't know that we made that argument below, Your Honor. And I guess what I'm not ready to concede is that the relationship he has with SBCC would somehow make him an employee of the funds for the purposes of the broker analysis. What is, how would you characterize his relationship with the two funds I mentioned? Well, he controlled the funds as a sort of factual matter. A broker doesn't control the sale as a factual matter, does he? Well, an issuer, like an issuer would as a factual matter, if they're acting as an issuer and handing out their own shares, what I suppose you could say control the sale. So in the sense that if Apple decides to give away 10 free shares of stock to each one of its employers, in that sense it's acting as an issuer and not a broker. That's not what happened here at all. Mr. Feathers used SBCC and SBC's employees to go out and sell these investments to investors. That's classic broker activity. And from what I can tell, he doesn't actually dispute that part of the district court's analysis. What he's disputing or what he's claiming is that he's not a broker as the statute defines it because he's an issuer, something else the statute defines. But he's not. And if you look at the statutory definition of issuer, he's clearly not. Issuer is one who issues. Now, his secondary argument is that he didn't violate Section 15's broker registration requirements because his business was exclusively interstate. Well, that's effectively an exemption from the registration requirement. And it's longstanding law that if you're claiming an exemption from a registration requirement, it's your burden to plead and prove it at that point. Now, he's pointed to this issue of a lack of interstate transactions as a failure of evidence on the commission's part. That's not really what's going on here. That's not actually the right way to read the statute. When you read Section 15, it says that basically every broker, except for those who fall in this thing, who uses instrumentality of interstate commerce to attempt to induce. So the statute doesn't require completed sales. To attempt to induce transactions has to register. If you look back at the definition of instrumentalities of interstate commerce or interstate commerce, it clearly includes intrastate use of a telephone. Congress consciously amended that definition in 1975 to broaden the reach of the registration provision. So even if he's right that there was some sort of pleading defect, we've identified evidence in the record that gets us past that hurdle of instrumentalities of interstate commerce. It then becomes his burden to plead and prove the exception, which he hasn't done here. He did not plead it below. By the way, Your Honor, this was forfeited. Simply pointing to exemptions from the 33X registration requirement isn't the same thing as claiming an exemption from the broker registration requirement. So your position is that he didn't raise any tribal issue of fact as to his use of the interstate instrumentalities? No, Your Honor. Not below he didn't. And that's sufficient to make him an interstate broker? Yes, Your Honor. All right. Go ahead. I was waiting to see if you had a question, Your Honor. On the question of disgorgement, since that did come up very briefly, as I understand his argument, he did not personally receive the money. It did not go into his own pocket. So, therefore, he should not be ordered to disgorge it. That's not consistent with longstanding law. Here it's undisputed that he controlled SBCC. It's also undisputed that he caused the funds to convey the money or to send the money to SBCC. These are undisputed facts. Now, the reason there is one explanation as to why there is no joint and several order of disgorgement here is that the funds were in receivership. So to order joint and several disgorgement wouldn't have made a lot of sense in the factual context of what Judge de Villa was dealing with there. The funds already were in receivership. Their finances were under control and being carefully examined. So, you know, how would you jointly and severally order the defendant, Mr. Feathers, to disgorge with funds that he no longer has control over? That's an explanation. But I think the principle articulated in those cases, that one is presumed to have obtained the benefit of the funds when they go to an organization or entities that are essentially him, still applies here. And, again, it is undisputed that he controlled SBCC, that he and his wife were the only signatories on these accounts. So the money essentially went to him and the disgorgement order is proper. As to his factual suggestion that this $7 million somehow included money that was I just don't think the record supports that at all for the reasons we explained in our brief. And I see I have – did the panel have any questions about the disgorgement or the broker issue before I move on? Go ahead. Okay. And I think as to Sienter and as to the question of the misstatements, these are largely tied together in a way. His argument on both accounts depends on his conclusion that the offering documents on their face don't prohibit loans to the fund manager. And I'd like to point out that he has – there's no evidence, he doesn't cite any evidence in the record that anyone be – anybody but him reads these documents this way. His accountant didn't read the no loans to manager provision that way. His lawyer didn't read the no loans to manager provision that way. Judge Davila didn't read the no loans to provision – no loans to manager provision that way. So he's put forward this articulation or this purported meaning of these offering documents. And I think we agree that offering documents have to be read in the whole, in context, and understood as a reasonable investor would read them. And for the reasons explained in our brief, I think that the reasonable reading of those documents is that there would be no loans to the fund manager. Now, if – As I understood the appellant's position, there would be no mortgage loans to the fund manager, but there was no representation there wouldn't be any unsecured loans to the fund manager. Well, that's also true. That's the second aspect of the misstatements that we're getting at. It's actually no loans and then no unsecured loans. So there's representations – That's not the way that your learned friend reads the offering document. He says the only representation is no mortgage loans. And I understand that's his proposed reading, and I understand where he gets that. He's looking at the headings of the document. But if you look at the text of the documents as a whole, it talks about standards applicable to all fund loans. It talks about certain lending guidelines. And a reasonable investor reading these as a whole, knowing what they were investing in, wouldn't think when they handed over their hard-earned money that this money will be used for anything but making well-secured mortgage loans. That's clearly the impression and the intention of these documents. And saying now that, oh, well, because there's the word mortgage in a heading here, investors wouldn't necessarily think that I can't make unsecured loans to myself. I just think it's not plausible. And the fact that this really isn't a plausible reading of the offering documents undermines much of his scienter argument. We don't dispute that the case law in this circuit has some discussion of a subjectivity element to recklessness as a basis for scienter. However, your belief has to be objectively, it has to be reasonable. It can't be just an assertion that this is what this means. There has to be some reasonable basis to think that that is subjectively reasonable to believe, if I may. There's a lot of subjectives in there. What you're saying is to have a valid subjective belief, you have to have some objective basis? Doesn't that clash with the idea between the objective and subjective? No, I think there has to be some basis for it, though, other than your own say-so. In other words, to walk in and say, I believe that this is how the documents should be read, okay, well, what evidence is there that that is how the documents should be read? And what evidence is there to support that that was the reasonable belief you felt? And here, his auditor already told him that that wasn't how the documents should be read. Again, he's the only person reading the documents this way. So I just, you know, as far as his scienter argument goes, the issue of subjective belief really is addressed mostly to the no loans to manager and the lack of security for the loans. He has the separate issue of the profits, making distributions in excess of the profits. And there he really has no basis for concluding that he didn't have scienter because his own people were telling him that he was making distributions in excess of the profits. And I apologize, Your Honor, I am now eating into the receiver's time and I would like for the court to be able to ask him questions. Fine. Let's have the receiver. Okay. Thank you, Your Honor. The commission asks that you affirm the district court. Please give him three minutes. Good morning, Your Honors. David Zaro on behalf of the receiver, Thomas Seaman. May it please the court. I'll have, unless the court have questions, I'll have less than three minutes, certainly. As you're aware, Mr. and Ms. Feathers filed five appeals that are still active. Each of these appeals arises out of an order concerning the administration of the receivership estate. In each case, the appeals were preceded by a motion for Judge Davila and extensive briefing. In each of those cases, Judge Davila, throughout this case, bent over backwards to attempt to provide Mr. Feathers with an opportunity to present whatever he wanted for the court. I'm sorry. Go ahead. No, I'm sorry. Along the way, the court considered his oppositions, his oral arguments. He would bring in investors. Throughout this period, he was provided every opportunity to present all of the evidence he had. I mention this because in reviewing these appeals, the standard that we're looking at here is whether or not Judge Davila abused his discretion in entering the orders concerning the administration of the estate. In doing so, we're talking about orders concerning the sale of the loan portfolios, the claims that were submitted by Mr. Feathers and Mrs. Feathers and other claimants in this case, along with the receiver's plan for distribution. I would submit that in each of these cases, Judge Davila certainly did not abuse his discretion. To the contrary, he challenged the receiver every step to go back and attempt to respond to arguments, even where there was not any evidence to support the allegations that were being submitted by Mr. and Mrs. Feathers. I would suggest there really is no basis to reconsider any of Judge Davila's positions. There was no abuse of discretion. On that, unless the court has any questions. I have none. Thank you very much. Thanks. Mr. Siegel, do you want to use three minutes for your rebuttal? Thank you, Your Honor. I'd like to turn just to the signature issue because I think that's really the key here. So this court in Platform Wireless said that, although we may consider the objective unreasonableness of the defendant's conduct to raise an inference of signature, the ultimate question is whether the defendant knew his or her statements were false or was consciously reckless as to their truth or falsity. So it is a subjective standard. But when he's told by his accountant and he's told by his lawyer that he's wrong, I mean, is he just headstrong? If he had continued making these statements after he was given those warnings, perhaps that would be enough to decide this issue as a matter of law. Those statements, those warnings came in 2012 after he had already issued all the offering documents. His lawyer never told him that his actions were contrary to the representations in the offering documents. So after he had ---- Did he know about it? Was there any evidence that the lawyer knew before Feathers has known himself? Not in the record, Your Honor, no. And, of course, this is the SEC's burden. Well, then obviously the lawyer wasn't in a position to advise him. Your Honor, in fact, the lawyer was actually wrong when he told Feathers what he told him, that at this point he was talking about the IPF offering documents. They did expressly allow for this. But, again, the SEC's burden was to show that his signature could be resolved as a matter of law. And that couldn't be done when there was no contemporaneous evidence that Feathers was told that his statements were misleading before he made them, when Feathers himself said in e-mails that he didn't understand the documents to be read that way. When, as the SEC has acknowledged, they understand, even if they deem our reading of the documents unreasonable, I would submit that it's fully reasonable, they understand where it comes from because of the headings in these offering documents that say general standards applicable to mortgage loans. SEC said that we have nothing to show that there's no signatory profits. That's because the SEC is not properly applying the signatory standard here. It's not just that he knew that the funds were issuing distributions in excess of profits. They have to prove as a matter of law that he knew that his statements in the offering documents regarding the distribution of member returns were misleading. There's absolutely no evidence in the record to suggest that Feathers understood himself to be representing that distributions could come only from fund profits. And, in fact, he told investors in the offering documents that they would not necessarily come from fund profits and that they could, in some circumstances, exceed those  And be a return of capital. Exactly, Your Honor. When he distributed in excess of profits and he distributed a return of capital, did he advise the investors of that fact so that they would not have to pay taxes on return of capital? It's not entirely clear from the record, Your Honor. There is one email, internal email, where his accountant suggested they would have to issue investors those sort of forms. That went from the accountant to Feathers. But the question is, was that made known to the investors? It's not clear from the record, Your Honor. I don't think that, again, given that it's the SEC's burden to prove science or as a matter of law, I don't know if that bears on anything. That's also not the SEC's claimed misstatement. All right. The claimed misstatement is that distributions would come only from profits. And he did not necessarily understand that to be misleading to investors. All right. Thank you very much, both of you, for your argument. And the matter of SEC versus Feathers is submitted. And before we adjourn today, I mean go in recess until tomorrow, I want to mark that this is the last time that our esteemed Judge Nelson, Dorothy Nelson, will be coming to panel hearings. From now on, she will be taking part in motions and other matters of the court. And I'd like to mark the fact that Judge Nelson has been a wise and warm member of our court for the last 40 years. She was appointed to the bench by President Jimmy Carter in December of 1979 and has served not only as a member of the court, but as a leader in the Western Justice Center, which forwards her goals of mediation and arbitration in the building next to our courthouse in Pasadena. And she came to the court with a distinguished history as being a graduate of UCLA Law School who deigned to become dean of the USC Law School. And then she went from being a fervent Bruin to a fervent Trojan. And she was the first woman who was ever the dean of a major law school in the United States, for which she was awarded Time Magazine's Woman of the Year Award, I believe, in 1969. So we're honored to have her here. We love the fact that she'll be part of the family. And we thank her for her many years of service and her warmth in the way she's treated all of us. So join me in giving a hand to Dorothy Nelson. Thank you. It's been my honor to serve the court. And as a former professor, I look out and see students there listening to this case today. I wonder if I would have decided to become a lawyer, to follow this difficult kind of thing with superb lawyers, I might add. But welcome you to the court. And my law clerks, and I think Judge Baez's law clerks and Judge Ferdandus's law clerks who are in the audience, will stay to talk to you while we confer. But be sure to ask them any questions about why they're studying law and what they intend to do to save the world as lawyers. Thank you, Judge Baez. That was an unnecessary but very much appreciated. Thank you. All right. Court is in recess. Thank you.
judges: D.W. Nelson, Fernandez, Bea